UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT


LUJEAN WILLIS BEARD,

                    Plaintiff,

vs.                                             CASE NO.: 07-CV-12189

COMMISSIONER OF SOCIAL SECURITY                 HON. SEAN F. COX
                                                MAG. JUDGE STEVEN D. PEPE
                    Defendant.
_____/

## REPORT AND  RECOMMENDATION

### 1.      Background

Plaintiff, Lujean Beard, brought this action under 42 U.S.C. §405(g) and §1383(c)(3) to

challenge a final decision of the Commissioner finding that she was not entitled to Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, Supplemental Social

Security Income ("SSI") and Disabled Widow's Insurance Benefits under Title XVI of the Social

Security Act.  Plaintiff and Defendant filed motions for summary judgment.  Both motions have

been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the

following reasons, **IT IS RECOMMENDED** that the Commissioner's motion for summary

judgment be **GRANTED**.


### A.      Procedural History

Plaintiff, Lujean Beard, applied for disability insurance benefits, supplemental security

income in July 2002, alleging that she became unable to work on September 13, 2000, due to

1

coronary disease, hypertension, depression and headaches (R. 56, 105, 315). Plaintiff's

applications were denied on both February 8, and December 16, 2002 (R. 38, 42, 311, 318).

Plaintiff appeared, with counsel, at a hearing before administrative law judge ("ALJ") Michael F.

Wilenkin on April 16, 2004 (R. 430-61). A vocational expert testified at this hearing. ALJ

Wilenkin's May 22, 2004, decision determined that Plaintiff was not eligible for DIB or SSI

benefits (R. 324-336). On August 27, 2004, the Appeals Council granted Plaintiff's request for

review and remanded the case to the ALJ to resolve inconsistencies regarding Plaintiff's work

record and the exertional and nonexertional demands of her past relevant work (R. 345-47).

On June 2, 2006, Plaintiff filed a Disabled Widow's Insurance Benefit ("WIB")

application (R. 42-24). A new administrative hearing was held before ALJ Wilenkin on June 29,

2006, at which Plaintiff was represented by an attorney, but no vocational expert testified (R.

462-86). At the hearing, Plaintiff's WIB application was escalated to the hearing level after an

initial denial (R. 18, 465). On August 30, 2006, the ALJ found Plaintiff was not disabled

because she remained able to perform her past relevant work (R. 15-24). The Appeals Council

denied review on March 16, 2007 (R. 8-10).


B.    **Background Facts**

1.    ***Plaintiff's Hearing Testimony and Statements***

Plaintiff was 56 years old at the time of the hearing (R. 467). Plaintiff last worked at a

woman's shelter for 4 ½ years as a resident assistant. In this position, Plaintiff answered the

telephone, admitted women to the shelter, provided food to residents, daily brought foodstuffs

from the basement for the cook to prepare and provided residents with clothing (R. 468).

Plaintiff was required to use a computer to perform her job (R. 469). Plaintiff generated daily

activity reports which she provided to her supervisor (R. 470-71).

The shelter was located in a three story building (R. 470). Plaintiff walked up the stairs several times each day to check on the women living at the shelter. She estimated that a typical work day required that she be on her feet 5 ½ to 6 hours (R. 471). Her seated activities included monitoring the door and checking the women to ensure that they were not bringing weapons into the building (R. 472). Plaintiff stated that she could not lift more than 5 or 6 pounds at a time, and if an item was heavier than that she would seek assistance.

When residents left the shelter, Plaintiff cleaned their rooms. This work required that she strip the beds, sweep the floor, clean the trash and ready the room for the next occupant.

Plaintiff stated that she suffers from coronary artery disease,[1] hypertension, trouble breathing, high blood pressure and blindness in her right eye due to a stroke (R. 473). She stated that she cannot remember everything. While not meeting with a psychiatrist or psychologist, Plaintiff is on medication for depression and anxiety including Xanax.

Since 2004, Plaintiff has been treated at Henry Ford and Sinai Grace hospitals for chest pains (R. 474). She experiences chest pain daily, and takes Endor, Lopressor, Aspirin and Notroglycerin (R. 475). Plaintiff stated that she has problems breathing (R. 474). These problems arise even when she is sitting, and she uses an inhaler to aid breathing.

Plaintiff's problems with her right eye continue, and she has developed problems with her left eye. Plaintiff does not currently wear corrective lenses, but admitted that she needed "to get some" (R. 475). Plaintiff has received State Disability Assistance since November 2005.

---

[1] The record refers to "coronary eye disease" which likely refers to coronary artery disease.

Other than coronary artery disease, hypertension, breathing problems, blindness in the right eye and anxiety, Plaintiff stated that she had no other medical problems that are disabling (R. 476).

ALJ Wilenkin asked Plaintiff how she determined whether or not her blood pressure was acting up, and she replied that she sees "little white diamonds" in front of her eyes and feels "funny, light headed and stuff" (R. 476-77). Plaintiff stated that she had been taking the same blood pressure medication for roughly 8 years, but it was changed to a higher dose (R. 477). Her chest pain varies in intensity. She did not lift weight heavier than 5-7 pounds because it caused chest pain (R. 479).

At the hearing the ALJ examined the applications filed by Plaintiff noting that Plaintiff in an October 2001 work history stated that her job required that she sit for 7 hours a day, stand and walk for 30 minutes each day (R. 62). It further stated that she did not have to climb, kneel, crouch or lift objects weighing more than 2 pounds. In an October 2001 disability report, Plaintiff stated that she lifted less than 10 pounds and that such lifting consisted of a few folders (R. 480). This Report also showed sitting for 7 hours a day (R. 480 referring to R. 79).

In work history report presumed to be from July 2002, Plaintiff indicated that she did not lift more than 10 pounds, but was now lifting clothing out of closets (R. 481 referring to R. 70). No mention was made of folders.

The ALJ also noted that in July 2002 Plaintiff filled out two reports one which had Plaintiff working 11 hours a day. The report indicated that she worked 11 hours a day by adding walking 4 hours, standing 2 hours, sitting 2 hours, climbing 2 hours and stooping 1 hours each

day.[2]  The other report, dated July 10, 2002, indicates that Plaintiff was walking 4 hours, standing two hours and sitting 1 hour per day (R. 106).

ALJ Wilenkin also refers to an April 2004 work history report filled out by Plaintiff, prior to her first hearing that stated that Plaintiff sat for 2 to 7 ½ hours, stood for 5-6 hours and walked for 6 hours each day.  Plaintiff also climbed stairs, pushed, pulled and lifted between 5-10 pounds (R. 481 referring to R. 136-37).

Plaintiff acknowledged the discrepancy in her record and sought to explain them (R. 482).  She worked as a care giver who sat with an elderly woman in her home (R. 481-82).  She performed this job 3 days a week for 4 hours at a time for seven months.  Plaintiff was paid in cash, and this money was not reflected in her earnings record (R. 483).  Plaintiff's earning record indicated that she earned $6,696 in 2001, but she is not sure if that is accurate or if that represents the Family Independence Act money that she was paid.

Plaintiff's attorney suggested that notwithstanding discrepancies in her forms, Plaintiff's performed work that was perhaps "low level semiskilled" even though the prior assessment had been unskilled (R. 484).

2.    _Medical Evidence_

On November 8, 2000, Plaintiff was examined at Sinai-Grace Hospital by Corey Voss, M.D., who noted that she complained of midsternal chest pain and pressure that was not associated with exertion (R. 182).  Dr. Voss noted that Plaintiff had no significant medical history, and ruled out unstable angina.  Her chest x-ray showed normal sinus rhythm and

---

[2] That report also states at the top that she worked 8 hours per day (R. 70).

Plaintiff was discharged on November 9, 2000 (R. 183).

On January 9, 2001, Plaintiff's primary care physician, Dr. Dakkak, conducted an electrocardiogram and found "some very worrisome changes" (R. 216). He directed Plaintiff to the Sinai-Grace Emergency Department for her chest pain where she was examined by Matthew Griffin, M.D. Dr. Griffin discussed Plaintiff with Dr. Dakkak, and they concluded that Plaintiff's condition justified her admission to the telemetry service (R. 218).

On January 10, 2001, the attending physician at Sinai-Grace examined Plaintiff, and found that Plaintiff possessed stuttering chest pain for the last two months (R. 222-24). She had a normal stress test in November 2000. Plaintiff had a history of substance abuse, and suffered from multiple coronary artery risk factors including: smoking and family history (R. 223). It was recommended that her cardiac rate and rhythm be monitored, and that serial enzymes and EKG be conducted to rule out a heart attack (R. 224). Aspirin, nitrates and low dose beta blockers were to be given. If chest pain continues, Plaintiff should be given intravenous nitroglycerin and heparin. It was also recommended that she undergo cardiac catheterization.

On January 11, 2001, Abhinav Raina, M.D., performed cardiac catheterization noting that Plaintiff will "need angioplasty and stenting of the left anterior descending coronary artery lesion" (R. 192). Preparation was made to transfer her to Providence Hospital for the needed services.

A January 15, 2001, Discharge Summary from Providence Hospital notes that Plaintiff was transferred from Sinai-Grace to Providence on January 12, 2001, for angioplasty (R. 228). While in the hospital, Plaintiff began complaining of general pain all over. Dr. Raina noted that Plaintiff was engaging in manipulative behavior, complaining of vague, unspecified pain in an

effort to procure methadone. Plaintiff's daughters also "were very difficult to work with and encouraged her manipulative, drug-seeking behavior" (R. 228). Upon discharge, she was to avoid strenuous activity and not to drive for several days (R. 229). Plaintiff was told to return to her drug treatment center for methadone, and was provided verbal instructions about how she should take the nitroglycerin provided her.

On October 23, 2001, Plaintiff presented at the Emergency Room of Sinai-Grace hospital with complaints of chest pain (R. 243). She was examined by Ann M. Garritano, M.D., who noted that Plaintiff suffered from associated symptoms of shortness of breath, diaphoresis and palpitations. Plaintiff denied suffering from fever, dizziness, chills or syncope. Plaintiff had been noncompliant with her medication, and had not followed up with a cardiologist as suggested by her primary care physician. A chest x-ray was negative, but given her medical history Dr. Garritano admitted Plaintiff to the hospital (R. 245).

On December 19, 2001, Plaintiff was examined at the Human Capability Corporation by R. Hassan, M.D., who noted that Plaintiff claimed that she had been depressed, "off and on" for years (R. 257-58). Plaintiff had been sexually abused, as a teenager, which resulted in her having nightmares and her seeing a therapist as a teenager (R. 257). Plaintiff became more depressed upon being diagnosed with coronary artery disease. Dr. Hassan observed that Plaintiff was realistic, not delusional or grandiose. She exhibited no bizarre behavior and possessed normal posture and gait. She denied hallucinations, delusions, persecutions, obsessions, thoughts controlled by others, unusual powers or suicidal/homicidal ideations. Dr. Hassan's diagnosed a mood disorder due to the diagnosis of coronary artery disease as well as a posttraumatic stress disorder (R. 258). Diagnosis of Axis II was deferred, Axis IV was deemed

moderate and Axis V include a GAF of 60.[3]  Plaintiff's prognosis was guarded.

On January 21, 2002, a cardiac catheterization was conducted by Dr. Abhinav after Plaintiff was referred with atypical chest pain (R. 260).  Dr. Abhinav observed that Plaintiff suffered from a single vessel disease with good ventricular functioning, and recommended medical therapy and risk factor modification for her (R. 261).

A Physical Residual Functional Capacity Assessment ("PRFCA") dated January 23, 2002, determined that Plaintiff could occasionally lift 10 pounds,[4] frequently lift less than 10 pounds, stand at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and engage in unlimited pushing and pulling (R. 175).  The Assessment noted that on October 23, 2001, Plaintiff had a normal range of motion as well as a urine test that was positive for "opiates and cannabinoids" (R. 176).  Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl.  Plaintiff was determined to have no manipulative, visual or communicative limitations, and her only environmental limitation was to avoid concentrated exposure to fumes, odors, dust or gases (R. 177-78).  In the margins it was noted that Plaintiff had "respiratory

---

[3] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32.  A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id*.  A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  *Id*.  A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning.  *Id*.

[4] Hand written in the margins the examiner indicated that Plaintiff could lift "approx 5 lb" (R. 175).

8

problems."  Additional comments to the PRFCA noted that Plaintiff was "a no show" for a July 24, 2001, echocardiogram, had a negative stress test November 12, 2001, exhibited drug seeking behavior and was consistently non-compliant with her medicine (R. 181).

A Psychiatric Review Technique Form ("PRTF") conducted on February 4, 2002, concluded that Plaintiff's impairment(s) were "not severe" even though she possessed "coexisting nonmental impairment(s) that requires referral to another medical specialty" (R. 152).  The PRTF determination indicated that Plaintiff suffered from an affective mood disorder (R. 155).  The PRTF found mild restrictions on Plaintiff's daily activities, maintaining social functioning, concentration, persistence or pace (R. 162).  Consultant's notes indicated that Plaintiff was "in touch with reality," "coherent," "logical," and possessed no "thought disorder" (R. 164).

On April 23, 2002, Dr. Dakkak conducted a Medical Examination Report of Plaintiff for the State of Michigan Family Independence Agency (R. 262-63).  The Report stated that Plaintiff could stand 2-3 hours a day, walk for 1 hour a day and sit for 4 hours (R. 263).  The Report noted that Plaintiff could never lift more than 5 pounds.  Dr. Dakkak noted that Plaintiff was not "medically stable or [a] candidate for any job."

On May 21, 2002, Dr. Abhinav examined Plaintiff who complained of heart burn and medication problems (R. 296).  Plaintiff's blood pressure was "high," and she claimed to be unable to obtain Toprol as it was not covered by Medicaid.  Plaintiff denied shortness of breath, presyncope or syncope, but does complain of intermittent palpitations.  Dr. Abhinav recommended that Plaintiff begin taking Toprol, follow-up in one week with her primary care provider for a blood pressure test and return in 3 months for a check-up (R. 297).

On July 25, 2002, Plaintiff went to the Sinai-Grace Emergency Room after experiencing chest pain for 4 days (R. 264). Robert T. Malinowksi, M.D., noted that Plaintiff's chest pain was located over the left anterior chest and could last for up to a couple minutes. Plaintiff experienced no shortness of breath, nausea/vomitting or diaphoresis, but was given a cardiac examination (R. 265). It was noted that Plaintiff had resumed smoking ten cigarettes per day. Dr. Shah, a cardiologist, examined Plaintiff and recommended a stress test to determine whether or not she had experienced a heart attack (R. 266). A chest x-ray showed that the heart and lungs appeared normal (R. 270).

On August 20, 2002, Dr. Abhinav examined Plaintiff (R. 279-83) noting that a heart attack had been ruled out on July 25, 2002 (R. 279). Dr. Abhinav found that Plaintiff "has normal coronary arteries, with a patent mid LAD stent," but "there could be an element of coronary artery spasm" (R. 283). Dr. Abhinav concluded that Plaintiff "can be managed very well with medical therapy alone, including therapy directed towards coronary artery spasm."

A PRFCA dated November 4, 2002, determined that Plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand/walk at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and engage in unlimited pushing/pulling (R. 167). Plaintiff could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl (R. 168). The examining physician noted that "the claimant's statements are not entirely credible" (R. 171).

A PRTF conducted on December 4, 2002, concluded that Plaintiff had "no medically determinable impairment" citing "insufficient evidence" (R. 138-151).

On January 28, 2003, Dr. Abhinav examined reporting EKG findings of normal sinus rhythm, normal intervals and no acute ST-T wave changes (R. 294). It was decided that she

would continue current medications (R. 295).

On March 12, 2004, Plaintiff came to the Emergency Room of William Beaumont Hospital complaining of a sudden loss of vision in her right eye (R. 299). Plaintiff also complained of left chest pain (R. 301).

A Discharge Summary filled about by Rodolfo Farhy, M.D., dated March 18, 2004, indicated that Plaintiff had been admitted to William Beaumont Hospital on March 13, 2004 (R. 303). Plaintiff experienced a groin hemotoma after cardiac catheterization (R. 304). Plaintiff complained of vaginal bleeding which revealed no abnormalities, but the PFO closure was treated. A coronary angiogram revealed an ejection fraction of 55% and noncritical coronary artery disease with stent. A pseudoaneurysm was ruled out, and it was noted that Plaintiff had trouble with pain management (R. 304). Liver function tests were normal.

On April 9, 2004, Dr. Farhdy wrote a letter "To Whom it May Concern" indicating that on March 24, 2004, he examined Plaintiff noting that she had recovered "very well" (R. 305).

On November 3, 2003, Plaintiff underwent a follow-up cardiac examination with Dr. Abhinav (R. 290-93). Plaintiff denied palpitations, presyncope, syncope, or shortness of breath, but did have a significant anxiety disorder (R. 290). The doctor's assessment recommended that Plaintiff continue taking aspirin, Imdur and Toprol (R. 293). Plaintiff's murmur was stable, and blood pressure well controlled on current medications (R. 293).

On January 7, 2005, Plaintiff was treated at the Sinai-Grace Emergency Room by Geoffrey A. Wiss, M.D. (R. 367). Plaintiff complained of chest pain, but her heart rate and rhythm were deemed normal and a chest x-ray confirmed this determination (R. 369). Inspection of Plaintiff's eyes revealed no acute abnormality as pupils were equal, round and reactive to light

(R. 368).  Extraocular muscles were intact, and no scleral icterus or conjunctival pallor was noted.

On January 8, 2005, after Plaintiff had been scheduled to undergo a stress test one month earlier the lab would not perform the test because the prescription was written incorrectly (R. 373).  A SPECT heart scan determined left ventricular enlargement, mild hypokinesia near the base of the left ventricle and normal perfusion (R. 380), and Plaintiff was discharged (R. 376).

Plaintiff was admitted to the Henry Ford Health System on July 19, 2005, for chest pain, and was discharged on July 22 (R. 385).  While awaiting admission, she underwent episodes of asymptomatic hypotension which was treated with IV fluid.  A chest x-ray was normal, and Plaintiff was stable upon discharge (R. 385).

Plaintiff went to the Sinai-Grace Emergency room on November 29, 2005, complaining of chest pain similar to when she had a cardiac stent inserted (R. 370).  Jason Moore, M.D., noted that Plaintiff complained of numbness and tingling in her left fingers.  Plaintiff's blood pressure was 162/82, and she exhibited normal heart rate and sinus rhythm (R. 371).  A chest x-ray showed normal cardiac size, normal mediastinum and normal soft tissues.  Plaintiff's pupils were found to be round, equal and reactive to light.  Extraocular muscles were intact and external inspection of the conjunctivae and lids showed no acute abnormality.

Keith Johnstone, M.D., on December 2, 2005, performed left cardiac catheterization which determined that she has "essentially normal coronary arteries" and "normal left ventricular systolic and diastolic function" (R. 378-79).

On May 8, 2006, Abbey A. Wumi, M.D., performed a Medical Assessment of Ability to do Work Related Activities (R. 403-04).  Dr. Wumi determined that Plaintiff could lift/carry less

than 5 pounds, stand 2 hours, and sit for 2 hours.  Plaintiff could never climb, stoop, crouch, kneel or crawl; and her ability to reach, handle, see, hear, and speak was affected (R. 404).

Plaintiff, on May 22, 2006, went to the Crestwood Medical Center Emergency Room complaining of "on and off" chest pain (R. 412).  Plaintiff was admitted.  Plaintiff's self-reported pain level was "5."

### 3.      ALJ Wilenkin's Decision

ALJ Wilenkin noted that Plaintiff's case was remanded by the Appeals Council given the existence of "conflicting evidence regarding the exertional and nonexertional requirements of the claimant's past work and a question as to whether claimant engaged in any substantial activity since September 13, 2000" (R. 19).

ALJ Wilenkin found that "while there are discrepancies in the claimant's statements with regard to work activity past September 13, 2000, and earnings records show quarters of coverage for 2001, with $6,696 in earnings," however, "the totality of evidence warrants a finding that the claimant did not engage in any substantial activity after her alleged onset date of September 13, 2000.

Plaintiff meets the nondisability requirements for a period of disability and DIB benefits, was insured for benefits through the date of this decision, and had not engaged in work since the alleged onset date.  Plaintiff has "severe" impairments of coronary artery disease, hypertension and possible stroke with residual blindness in the right eye, but none of these impairments equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4.  20 C.F.R. § 404 (R. 20).  There is no evidence of any mental impairment that would be considered "severe."

13

ALJ Wilenkin determined that Plaintiff's allegations concerning her limitations are not totally credible for the reasons set forth in the body of the decision, and found that she has the residual functional capacity for light work (R. 23). The ALJ found that Plaintiff's past relevant work did not require the performance of work-related activities precluded by her residual functional capacity. Further, her coronary artery disease, hypertension and possible stroke with residual blindness in her right eye did not prevent her from performing her past relevant work (R. 24).

ALJ Wilenkin found that Plaintiff was not under a "disability" as defined in the Social Security Act, at any time through the date of decision (R. 24).

## II. ANALYSIS

### A. Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[5]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.**     **Factual Analysis**

Plaintiff asserts that ALJ Wilenkin erred by (1) finding that Plaintiff's testimony was not totally credible, (2) issuing a finding regarding Plaintiff's residual functional capacity that is not supported by substantial evidence and (3) determining that Plaintiff could perform her past relevant work (Dkt. # 18, p. iii)**.**

In his decision, ALJ Wilenkin noted that his prior decision in this matter "was vacated by the Appeals Council and the case was remanded" as the Appeals Council "concluded that the issue of past relevant work was never resolved.  In particular the Appeals Council noted that there was conflicting evidence regarding the "exertional and nonexertional requirements of the claimant's past work and a question as to whether the clamant engaged in any substantial activity

---

[5] *See, e.g.*, *Varley v.  Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir.  1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v.  Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir.  1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v.  Heckler*, 810 F.2d 786, 790 (8th Cir.  1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir.  1975); *Noe v.  Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

since September 13, 2000" (R. 19).  It was these matters that ALJ Wilenkin was asked to resolve.

1.      **Plaintiff's Credibility:**

Plaintiff avers that ALJ Wilenkin, at the June 29, 2006, hearing failed to address her credibility in the required manner.  In his August 30, 2006, Decision ALJ Wilenkin stated that "claimant's allegations regarding her limitations are not totally credible for reasons set forth in the body of the decision" (R. 23) noting that her testimony "was thoroughly evaluated under the guidelines of SSR 96-7p and 20 C.F.R. 404.1529" (R. 21).

SSR 96-7p notes that:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility.  The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.  This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

In addition to examining objective medical evidence, 20 C.F.R. §404.1529 examines other evidence relevant to an claimant's symptoms including:

> (I) your daily activities; (ii) the location, duration, frequency and intensity of your pain or other symptoms; (iii) precipitating or aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your

16

> pain or other symptoms; (v) treatment, other than medication, you
> received or have received for relief of your pain or other
> symptoms; (vi) any measures you use or have used to relieve your
> pain or other symptoms (e.g., lying flat on your back, standing for
> 15 or 20 minutes every hour, sleeping on a board, etc.); and (vii)
> other factors concerning your functional limitations and
> restrictions due to pain or other symptoms.

20 C.F.R. §404.1529(c)(3)(I-vii).

This Circuit is clear that credibility determinations require that the ALJ do more than make a single, conclusory statement regarding an individual's credibility, but rather specific findings based on the criteria provided by SSR 96-7p and 20 C.F.R. §404.1529. *See Calhoun v. Commissioner of Social Security*, 338 F. Supp. 2d 765 (E.D. MI 2004). *See also Rogers v. Commissioner of Social Security*, 486 F. 3d 234 (6th Cir. 2007) (noting that credibility determination must be reasonable and supported by substantial evidence).

Nowhere in his August 30, 2006, decision does ALJ Wilenkin address the factors required by statute or Social Security Rule. Rather, he concludes that Plaintiff's testimony was not entirely credible. Failure on the part of the ALJ to justify his credibility determination would normally constitute error on the part of the ALJ.

This case does not involve a typical ALJ review under 20 C.F.R. §404.929 because it involves a remand by the Appeals Council with the requirement that the ALJ address specific questions. *See* 20 C.F.R. §404.977 (describing the process by which the Appeals Council may remand a case to an ALJ). Specifically, 20 C.F.R. §404.977(b) states that the ALJ "shall take any additional action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. §404.977(b); *See Tyra v. Secretary of Health & Human Services*, 896 F.2d 1024 (6th Cir. 1990) (noting Appeals Council remand to an ALJ under 20 C.F.R. §404.997). Given this, it is not clear

that the ALJ's failure to address Plaintiff's credibility is in error.

ALJ Wilenkin has issued two decision in this case. In his first decision, the ALJ utilized the five-step sequential process (20 C.F.R. §§ 404.1520 and 416.920) and clearly addressed Plaintiff's credibility. In the second decision, the ALJ addressed the specific questions raised in the Appeal Council's remand. The ALJ's failure to restate the five-step process and the bases for his credibility determination in his second decision constitutes harmless error.[6] In his May 22, 2004, decision, ALJ Wilenkin made extensive, detailed findings in support of his credibility determination. Thus, when analyzing whether the ALJ adequately addressed Plaintiff's credibility, this Court should read the ALJ's two decisions in tandem.

With regard to Plaintiff's daily activities, the ALJ noted in his first decision that Plaintiff continued to smoke, had not altered her diet, lived a sedentary life, did not exercise, did not follow up with her doctor and was not compliant in her medication (R. 331-32). Such behaviors go to the core matter of how serious Plaintiff considered her problems as well as her efforts to

---

[6] *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005) (citing *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir.1996)) ("But *Clifton* did not categorically reject the application of harmless error analysis in the present context. To be sure, we apply harmless error analysis cautiously in the administrative review setting. But as we explained in *Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004), harmless error analysis 'nevertheless may be appropriate to supply a missing dispositive finding ... where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.' ").

In *Fischer-Ross*, the ALJ's failure to provide more than summary conclusion that social security disability claimant did not meet the criteria of any listed impairment, at step three of the disability analysis, was harmless error because the ALJ's findings at other steps of the sequential process may provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment. *See also Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless error analysis may be appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on material the ALJ considered, the court can confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")

address them.

Plaintiff stated that she ceased intravenous drug use in September 2000 (R. 329). In October 2001, Plaintiff tested positive for opiates, and in December 2001 she told Dr. Hasan that she did not use drugs or alcohol. Yet, Plaintiff, when hospitalized, exhibited drug seeking behavior.

ALJ Wilkensen determined that Plaintiff's claims of mental illness were not credible given their sudden appearance in the record and the lack of evidence supporting the claim of intrusive flashbacks (R. 328-29). Similarly, he found her claims of depression and isolation inconsistent with Plaintiff's ability to interact with others, read, perform light chores and prepare light meals. Plaintiff was proscribed Xanax "as needed" and the record did not support Plaintiff's claim that she had also been prescribed Paxil and Valium (R. 332). Further undermining Plaintiff's credibility about her symptoms, was the ALJ's observation that during her testimony she:

> sat at ease, drew upon her memory to answer questions pertinently, maintained her concentration, responded normally other than some agitation at being asked specifics, gestured freely with her arms and hands, and rose to her feet without difficulty at the conclusion. There was no indication of the symptoms to which she testified" (R. 332-33).

The ALJ's recorded observations of Plaintiff's demeanor may play a role in a credibility determination given that as the trier of fact, the ALJ is given deference on account of his opportunity to observe the witness. *See Jones v. Commissioner of Social Security*, 336 F.3d 469, 476 (6th Cir. 2003).

Plaintiff's reporting of her work history, with its varying details about her work duties,

was cited by the ALJ as another factor undermining her overall credibility. Plaintiff stated that her cardiac problems caused her to cease working two months prior to her first presenting at the Emergency Room in November 2000 (R. 331). Plaintiff did not begin treating with a cardiologist until January 2001.

Plaintiff's first work history "indicated that her job required her to sit for seven of eight hours a day" (R. 62). This was the same 7 hour sitting reported in her disability report completed earlier that month (R. 79). But her subsequent work history and disability reports "described her past work as quite exertionally demanding" (R. 333 referring to R. 70 and R. 102). These have her walking, standing or climbing most of the day with only 2 hours sitting. The ALJ opined that these inconsistencies "reflect poorly upon the claimant's credibility," and "in summary, all of the factors used to evaluate credibility point to a lack of it in this case."

Second, it is not at all clear that the ALJ was required to address the Plaintiff's credibility again on remand as it was outside the scope of the Appeals Council remand order. In its order remanding the decision, the Appeals Council remanded the case noting that the ALJ will

> resolve the inconsistencies as to the exertional and nonexertional demands of the claimant's past relevant work, determine whether the claimant has performed substantial gainful activity since September 13, 2000, and if warranted, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base.

(R. 346-74, Appeals Council Order of Remand dated August 27, 2004).

Because ALJ Wilenkin's prior credibility determination was not addressed in the Appeals Council's remand order, he was not required to re-examine Plaintiff's credibility, in his second decision.

## 2.    Exertional Demands of Plaintiff's Work

In considering the conflicting evidence regarding the exertional and nonexertional demands of Plaintiff's prior employment as a residential assistant, her reports regarding workplace duties, coupled with her testimony on the matter, varied widely and shed little light onto her actual workplace duties. Plaintiff agrees with the ALJ Wilenkin that her prior work was "performed at the light exertional level" (Dkt. # 18, p. 18).

Disagreement arises as to whether or not Plaintiff can perform her prior work with Plaintiff claiming that she could only perform sedentary work. *Id*. at 19.  Plaintiff alleges that the ALJ ignored the analysis and opinions of her treating physicians, Doctors Dakkak and Wumi. Doctor Dakkak opined in 2002 that Plaintiff can never "lift/carry" over 6 pounds, can stand 2-3 hours a day, walk approximately 1 hour a day and sit approximately 4 hours a day, possessed mental limits with comprehension and memory and is not medically stable for a job" (R. 236). Dr. Wumi determined in May 2006 that Plaintiff could not maintain a full-time job (R. 22).

The regulations limit the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 404.1527(d)(2).  Under 20 C.F.R. § 404.1527(e), the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.[7]  Given the absence of objective medical evidence supporting Plaintiff's claims, as well as

_____

[7] In 20 C.F.R. § 404.1513(b) &(c) [SSI § 416.913 (b) &(c)] and SSR 96-5p the Commissioner  distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity."  The former is a physician's opinion on either physical or psychological  capacities for

the evidence that Plaintiff had a negative stress test in May 2006, controlled her hypertension with medication and could manage her personal care needs and in all other respects is able to function on a daily basis, substantial evidence supports the ALJ's decision to discount the claims of Doctors Wumi and Dakkak. Accordingly, Plaintiff has failed to show that her conditions prevented her from performing her prior work.

Even if a treating source's opinion is not given controlling weight, such an opinion is still entitled to some degree of deference, particularly if there is a long treating relationship as here, and that treating physician's opinion must be weighed using the factors in 20 C.F.R. §404.1527. S.S.R. 96-2p. Dr. Dakkak's 2002 determination about what Plaintiff could do is undermined by the absence of medical records from Dr. Dakkak. Without these records, it is impossible to determine the basis for Dr. Dakkak's conclusions. Plaintiff's counsel noted that "Dr. Dakkak's office records appear to be missing from the Administrative Record. The undersigned did not represent Ms. Beard at the administrative level" (Dkt. 18, p. 15, fn. 42). Plaintiff's failure to obtain, or explain the absence of these records, greatly limits her case.

Further, the ALJ reasonably did not rely on Dr. Dakkak and Doctor Wumi's opinions

---

work related activities. The former, when based on the medical source's records, clinical and laboratory findings, and examinations can be considered a "medical opinion" under § 404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion." Yet, because these medical opinions are different from the formal findings under § 404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" – which are subjects reserved to the Commissioner and which may be based on additional evidence in the record – the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], i.e. the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." Dr. Wumi failed to provide any clinical or objective evidence for the claim that plaintiff could not maintain a full-time job.

because they were not consistent with evidence in the larger record including: Plaintiff's denials of shortness of breath, successful stent replacement, normal blood pressure readings and negative stress tests (R. 22, 378-79, 398). Further, a PRFCA concluded on November 4, 2002, directly contradicted many of the findings made in Dr. Dakkak's April 23, 2002, Report to the Family Independence Agency (R. 166-74). Whereas Dr. Dakkak stated that Plaintiff could never lift more than 5 pounds, the PRFCA stated that Plaintiff could occasionally lift 10 pounds. Dr. Dakkak reported that Plaintiff could stand 2-3 hours a day, walk for 1 hour a day and sit for 4 hours (R. 263). The PRFCA conducted 7 months after Dr. Dakkak's examination that Plaintiff could stand/walk at least 2 hours, and sit for about 6 hours in an 8-hour workday. Based on the evidence provided in the record, the ALJ reasonably determined that Plaintiff could perform her past work.

Given the existence of substantial evidence, **IT IS RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** and Plaintiff's motion for summary judgment be **DENIED**.

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of*

*HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.


Date: July 8, 2008.                         s/Steven D. Pepe                

Ann Arbor, Michigan                   United States Magistrate Judge




### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing ***Report and Recommendation***  was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 8, 2008.



                         s/ Alissa Greer                          
                         Case Manager to Magistrate
                         Judge Steven D. Pepe
                         (734) 741-2298